IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
November 10, 2020 Session

## STATE OF TENNESSEE v. TOREY JAY ESTES

**Appeal from the Circuit Court for Gibson County**
**No. 20107     Clayburn Peeples, Judge**

_____

## No. W2019-01676-CCA-R3-CD

_____

A Gibson County jury convicted the defendant, Torey Jay Estes, of attempted voluntary manslaughter, attempted first-degree murder, aggravated assault, and false imprisonment for which he received an effective sentence of thirty-five-years, eleven months, and twenty-nine days.  On appeal, the defendant challenges the sufficiency of the evidence supporting his conviction for attempted first-degree murder and an evidentiary ruling regarding the admissibility of the victim's 9-1-1 call into evidence.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and TIMOTHY L. EASTER, J., joined.

Alexander D. Camp, Jackson, Tennessee (on appeal) and Michael A. Carter, Milan, Tennessee (at trial), for the appellant, Torey Jay Estes.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Frederick Hardy Agee, District Attorney General; and Jason Scott and Scott G. Kirk, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Facts and Procedural History

On November 17, 2015, the defendant stabbed the pregnant victim, Amanda Kafer, multiple times in the face, chest, and stomach with a pocket knife.  As a result of his actions, a Gibson County grand jury indicted the defendant for attempted first-degree murder of the

victim (count 1), attempted first-degree murder of the victim's unborn child (count 2), aggravated assault (count 3), and especially aggravated kidnapping (count 4).[1] The defendant proceeded to trial on March 18, 2019, where the following evidence emerged.

The victim testified she and the defendant dated for approximately nine years beginning in 2006 and had a daughter together in 2009. Prior to her relationship with the defendant, the victim had a son with whom the defendant regularly spent time. In February 2015, the victim and the defendant ended their relationship but maintained daily contact. In July 2015, the victim began dating Justin Freeman, and the two were expecting a child by October 2015. The victim subsequently informed the defendant that she was pregnant and planned to learn the gender of the baby during an ultrasound appointment on November 17, 2015.

A few days before the appointment, the defendant told the victim that if the baby was a girl, he wanted the victim to break up with Mr. Freeman in order for the defendant and the victim to raise the baby together. But, the defendant stated if the baby was a boy, he "wanted [the victim] to have an abortion" because "he wasn't raising another bastard boy." The victim stated she would not have an abortion, and the defendant responded, if she did not "have an abortion that he was just going to have to kill us both."

At the ultrasound appointment, the victim learned she was having a boy. After the appointment, the defendant continuously called the victim to learn the gender of the baby. When the victim answered the defendant's call, she told the defendant she was having a boy and asked him to leave her alone. The defendant continued calling the victim, stating "If it's really over, then it's over. . . . It's a boy. It's really over. Just come over and let's talk about what we're going to do about [our daughter] and get some of her belongings." The victim agreed and drove to the defendant's trailer around 12:00 p.m. The victim left the keys in her car's ignition before entering the trailer.

Once inside, the victim quickly hid her cell phone in her pants, and the defendant began telling her to break up with Mr. Freeman. During their discussion, the defendant asked where the victim's cell phone was, and the victim stated she did not have it with her. At one point, the defendant left the trailer. When he returned, the defendant asked the victim to lay down with him "one last time," but she declined. The defendant then entered the bedroom, and the victim went outside to try to leave because "something wasn't right." However, when she returned to her car, she discovered her keys were no longer in the ignition.

---

[1] Two indictments were initially issued against the defendant. The trial court merged the indictments, and the defendant proceeded to trial on the four charges listed above.

The victim returned to the trailer and asked the defendant for her keys. The defendant claimed he did not have them and asked the victim to sit on the couch with him. The victim again declined. When the victim stated she was leaving, the defendant told her she was not going to leave. The victim felt threatened but questioned the defendant as to what he meant by his statement. In response, the defendant stated, "I'll show you." The defendant then pulled a knife out of his pocket, "flipped it open[,] and shoved [the knife] in [the victim's] gut." The victim grabbed her stomach and fell to the floor. The defendant told the victim "to pull [her] shirt up so he could see what the f*** he was doing," that "he was going to cut [her] baby out of [her]," and she "was going to watch [the baby] die." The victim begged the defendant to stop, explaining they could make the initial stabbing look like an accident. Instead, the victim saw "rage" in the defendant's eyes as he told her no one would find her body.

The defendant forced the victim into the bathroom, turned on the shower, and told her that he "was washing the blood down the drain." The defendant continued to stab the victim, and the victim continued to beg the defendant to change clothes so they could make the attack look like an accident. The defendant, however, continued cutting, hitting, and fighting the victim. The victim noted that although the defendant remained calm, he also "just got angrier and angrier" throughout the attack, stating "he would feed [her] to the hogs and that one hog could devour a human body in seven minutes."

The defendant eventually exited the bathroom. The victim shut the door and called 9-1-1. When the defendant returned, the victim again begged him to change clothes and expressed her concern for her children if she died and he went to prison. Regarding the victim's other children, the defendant replied that he would "take care of them too." After the defendant exited the bathroom a second time, the victim "wedged [herself] between the commode and the door." She again called 9-1-1 as the defendant attempted to get back inside.

During the victim's testimony, the trial court listened to a recording of the 9-1-1 calls outside of the presence of the jury and determined the recordings were admissible. The State then played portions of the 9-1-1 calls. Throughout the initial call, the victim is heard screaming, and the defendant is heard telling the victim to stop fighting him. The victim explained she ended the first 9-1-1 call because she thought she was dying.

Portions of the second call were also played during which the victim is heard telling the operator the defendant's name and that he stabbed her. The victim is also heard telling the defendant that she called 9-1-1 and that the police were likely outside the trailer which caused the defendant to open the front door. Johanna Harrell, the Director of 9-1-1 operations for Gibson County, identified the incident call sheet created for the victim's initial 9-1-1 call made at 1:54 p.m. The incident call sheet was entered into evidence.

When the defendant opened the front door, the victim exited the bathroom, "barreled" through the door, and ran from the trailer. The defendant followed the victim, stating, "Come here, Baby. Let me help you. We can find who done this to you. Let me help you." Once outside, the victim encountered Sergeant Terrance Clark of the Gibson County Sheriff's Department and Bradford Police Department Officer Mike Hensley both of whom responded to the 9-1-1 calls. Sergeant Clark testified that as he approached the scene, he saw the victim "wobbling down a hill holding her stomach." The victim was "hysterical," covered in blood, and stated she had just been stabbed. Similarly, Officer Hensley "found the victim at the edge of the street. She was covered in blood, [and] hysterical." The victim told Officer Hensley that her boyfriend stabbed her after an argument "[a]nd the only way that she could get away from him was to tell him that she would tell the police that somebody broke in and stabbed her."

The victim identified the defendant's trailer, and Sergeant Clark and Officer Hensley approached and knocked on the door. The defendant was on his cell phone when he answered the door and appeared "unconcerned." When the defendant refused to get off the phone, Sergeant Clark removed the defendant from the trailer, handcuffed him, and took him into custody. While still on the scene, Sergeant Clark located a knife in the front yard. Officer Hensley collected the knife, describing it as a four-inch, serrated lock-blade pocket knife. Bradford Police Department Lieutenant Sherman Perry transported the knife and additional evidence to the Tennessee Bureau of Investigation (TBI) Crime Lab, documentation of which was entered into evidence for identification only.

Jesse Shanklin, an Advanced EMT for Gibson County EMS, also responded to the scene where he found the victim "standing in the road wrapped in a blanket [and] covered in blood from head to toe." The victim had stab wounds to her face, sternum, and stomach. After aiding the victim, Mr. Shanklin transported her to the hospital where she remained for eight days. The victim testified that in addition to being stabbed in the stomach, the defendant also stabbed her chest, neck, face, and eye socket which resulted in scars and caused nerve damage to her eye. Despite being stabbed in the stomach, the victim successfully delivered her baby on May 16, 2016. In numerous photographs entered into evidence, the victim identified herself and the injuries she suffered, the interior and exterior of the defendant's trailer, and the knife the defendant used during the attack.

The State also entered the victim's medical records into evidence, portions of which were read to the jury. A discharge report dated November 25, 2015, indicated the victim's principal diagnoses was an "assault with multiple knife stab wounds to [the] head, chest, and abdomen and a 13-week pregnancy including anxiety." The report further noted the victim underwent "an abdominal exploration for penetrating knife stab wound and repair of lacerations to [the] forehead."

Samantha Spencer, an expert in the field of serology and DNA analysis, testified regarding the DNA analysis she performed on a shirt from the master bedroom of the trailer, saliva standards of the defendant and victim, the knife found in the front yard, and the defendant's shirt, pants, and socks. Notably, Ms. Spencer found blood on the blade and handle of the knife which contained the victim's DNA profile. The blood located on the handle also contained the DNA of a minor male contributor. After additional testing, Ms. Spencer determined the profile of the minor male contributor was consistent with a mixture of at least two males, the major contributor profile of which matched the defendant. Ms. Spencer opined that the defendant could not "be excluded as a source of this male DNA profile and, barring a mutation, neither [could] any of his paternal male relatives." Ms. Spencer also found the victim's blood on the defendant's jeans. She issued two reports detailing her findings, both of which were entered into evidence.

Before the close of the State's proof, the defendant stipulated to the admission of numerous photographs of the scene taken by Bradford County Police Department Captain Michael Gertsch. The defendant then moved for a judgment of acquittal which the trial court denied, and the jury convicted the defendant of the lesser-included offense of attempted voluntary manslaughter of the victim in count 1, attempted first-degree murder of the victim's unborn child in count 2, aggravated assault in count 3, and the lesser-included offense of false imprisonment in count 4. The trial court sentenced the defendant to four years in count 1, twenty-five years in count 2, six years in count 3, and eleven months and twenty-nine days in count 4. The trial court ordered the sentences to be served consecutively in the Tennessee Department of Correction and the county jail. The trial court subsequently denied the defendant's motion for a new trial, and this timely appeal followed.

## *Analysis*

On appeal, the defendant argues the trial court erred in charging the jury with attempted first-degree murder of the victim's unborn child in count 2 and admitting portions of the victim's 9-1-1 calls into evidence. We will address each issue below.

### I.    *Attempted First-Degree Murder of the Victim's Unborn Child*

The defendant argues the State failed to establish evidence of premeditation in count 2, which charged the defendant with attempted first-degree murder against the victim's unborn child, and as a result, the trial court should not have presented this as "a possible conviction for the jury." When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13 (e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)).

This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The jury convicted the defendant of the attempted first-degree, premeditated murder of the victim's unborn child. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). First degree murder is "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)).

The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

The defendant argues the evidence is insufficient to support his conviction for first-degree premeditated murder because the proof at trial demonstrated that when the victim

"refused to leave her boyfriend and get back together with [the defendant], he acted in a fit of rage and attacked [the victim], stabbed her in the stomach, and trapped her in the trailer bathroom." The defendant asserts this evidence established that the defendant's "actions required no deliberation but were rather based on emotion from the heat of the moment." We disagree.

The record establishes that the victim informed the defendant she was pregnant and planned to learn the gender of the baby on November 17, 2015. Several days prior to the appointment, the defendant expressed his desire to raise the child with the victim if the baby was female but ordered the victim to abort the baby if the baby was male. On November 17, 2015, the defendant repeatedly called the victim to learn the gender of the baby. After the victim told the defendant she was having a boy, the defendant asked the victim to come to his trailer, and she complied. Upon arrival, the victim left the keys to her car in the ignition and hid her cell phone. Inside the trailer, the defendant told the victim to break up with Mr. Freeman and twice asked her to sit with him. The victim declined the defendant's requests and attempted to leave. However, when she went to her car, the keys were no longer in the ignition.

When the victim went back inside the trailer, the defendant told the victim she could not leave, pulled a knife out of his pocket, and stabbed the victim directly in the stomach. As the defendant continued to attack the victim, he told her "to pull [her] shirt up so he could see what the f*** he was doing," that "he was going to cut [her] baby out of [her]," that she "was going to watch [the baby] die," that "he would feed [the victim] to the hogs, and that "one hog could devour a human body in seven minutes." The defendant wounded the victim's stomach, chest, neck, and face, forced the victim into the shower, and attempted to wash the blood from her injuries away.

The victim called 9-1-1 twice before ultimately escaping the trailer and encountering the responding officers. The defendant threw the knife he used to stab the victim in the yard and seemed "unconcerned" when approached by Sergeant Clark and Officer Hensley after the attack. Though she was stabbed multiple times, including directly in the stomach, the victim survived and successfully delivered the child she carried in May 2016.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes that prior to the attack, the defendant expressed his desire for the victim's child to be aborted if male. Within hours of learning the baby was a boy, the defendant carried out an attack on the victim during which he directly stabbed her in the stomach and stated he intended to kill the baby. Further, the defendant called the victim and asked her to come to his trailer, placed a knife in his pocket before her arrival, and removed the victim's keys from her car's ignition. *See Bland*, 958 S.W.2d at 660. After

the initial stabbing, the defendant forced the victim into the shower in an attempt to wash the blood away. When the victim fled the trailer, the defendant threw the knife in the yard, went back inside the trailer, and began using his cell phone. Officer Hensley described the defendant as "unconcerned" during their encounter. *See Larkin*, 443 S.W.3d at 815-16. Though the victim testified she saw "rage" in the defendant's eyes during the attack, this testimony does not discount the abundant amount of evidence of premeditation detailed throughout the record regarding the defendant's attempt to kill the victim's unborn child. As such, the record supports the trial court's charge in count 2 and the jury's finding of premeditation in that the defendant carried out an attack on the unborn child "after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). The defendant is not entitled to relief.

## II. *Admissibility of the 9-1-1 Calls*

The defendant argues the trial court erred in admitting portions of the victim's 9-1-1 calls, asserting the admission of the calls violated Rule 403 of the Tennessee Rules of Evidence because the recordings were unduly prejudicial, cumulative, and "did not provide any relevant information to resolve a dispute of fact." The admissibility of evidence, however, rests within the sound discretion of the trial court, and this court will not overturn the trial court's decision absent an abuse of that discretion. *State v. Clayton*, 535 S.W.3d 829, 859 (Tenn. 2017). An abuse of discretion occurs when the trial court "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *State v. Lewis*, 235 S.W.3d 136, 141 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (internal quotation omitted). Further, "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" *State v. Young*, 196 S.W.3d 85, 106 (Tenn. 2006) (citations and internal quotation marks omitted); *see also State v. Wooten*, No. E2018-01338-CCA-R3-CD, 2020 WL 211543, at *7-8 (Tenn. Crim. App. Jan. 13, 2020), *appeal denied* (June 3, 2020).

Here, the defendant has failed to show the trial court abused its discretion by admitting portions of the victim's 9-1-1 calls into evidence. The trial court, however, determined the probative value of the calls was not outweighed by the danger of unfair prejudice, and we agree. The victim detailed the attack during trial and explained what was happening during the 9-1-1 calls as portions of the calls were played for the jury. The defendant has failed to establish that this combination of proof presented by the State elicited emotions of bias, sympathy, hatred, contempt, retribution, or horror. *See Young*, 196 S.W.3d at 106. Rather, the record indicates the portions of the calls played for the jury merely corroborated the victim's testimony regarding the attack and how she utilized the calls to escape the trailer. The defendant is not entitled to relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the rulings of the trial court.

_____
J. ROSS DYER, JUDGE